**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 7 |
| *The Worth Collection, Ltd.*, | ) |
| | ) Case No. 20-10337 (BLS) |
| Debtor. | ) |
| | ) |
| DOUGLAS T. TABACHNIK, in his capacity as the chapter 7 trustee of the bankruptcy estate of The Worth Collection, Ltd., | ) |
| | ) |
| | ) |
| | ) Adv. Proc. No. _____ |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NEW WATER CAPITAL GP, LLC; NEW WATER CAPITAL, L.P.; NEW WATER CAPITAL PARTNERS, L.P.; NWC WORTH COLLECTION HOLDINGS, LLC; WORTH INVESTMENT HOLDINGS, LLC; WORTH COLLECTION INTERMEDIATE HOLDINGS, LLC; JOHN DOES 1-10; DOE CORPORATIONS 1-10; DOE LIMITED PARTNERSHIPS 1-10; and DOE LIMITED LIABILITY COMPANIES 1-10, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Douglas T. Tabachnik, solely in his capacity as the chapter 7 trustee appointed in the above-captioned bankruptcy case (the "*Trustee*"), and as plaintiff in the above-captioned adversary proceeding, hereby alleges, upon his own knowledge or upon information and belief, as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

2. Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to a chapter 7 bankruptcy case currently pending in this district, captioned as *In re The Worth Collection Ltd.*, Case No. 20-10337 (BLS) (the "*Chapter 7 Case*").

7. This matter is a core proceeding pursuant to, without limitation, 28 U.S.C. §§ 157(b)(2)(A), (C), and (O).

8. To the extent this Complaint sets forth causes of action that are not core proceedings, the Trustee consents, pursuant to 28 U.S.C. § 157(c)(2), to this Court hearing and determining such matters.

**PARTIES**

9. The Trustee is the chapter 7 trustee appointed to administer the Debtor's bankruptcy estate in the Chapter 7 Case.

10. Upon information and belief, Defendant New Water Capital GP, LLC ("*NWCGP*") is a Delaware limited liability company having a principal place of business at 2424 North Federal Highway, Boca Raton, Florida.

11. Upon information and belief, Defendant New Water Capital, L.P. ("*NWC*") is a Delaware limited partnership having a principal place of business at 2424 North Federal Highway, Suite 418, Boca Raton, Florida.

12. Upon information and believe, Defendant New Water Capital Partners, L.P. ("*NWCP*") is a Delaware limited partnership having a principal place of business at 2424 North Federal Highway, Suite 418, Boca Raton, Florida.

13. Upon information and belief, Defendant NWC Worth Collection Holdings, LLC ("*NWCWCH*") is a Delaware limited liability company having a principal place of business at 2424 North Federal Highway, Suite 418, Boca Raton, Florida.

14. Upon information and belief, Defendant Worth Investment Holdings, LLC ("*WIH*," and together with NWCGP, NWC, NWCP, and NWCWCH, the "*Subsequent Transferees*") is a Delaware limited liability company having a principal place of business at 2424 North Federal Highway, Suite 418, Boca Raton, Florida.

15. Upon information and belief, Defendant Worth Collection Intermediate Holdings, LLC ("*Intermediate*" or "*Initial Transferee*," and together with NWCWCH and WIH (the "*Debtor Affiliates*," and together with the Debtor, the "*Worth Entities*," and together with NWC, NWCP, NWCWCH, and WIH, the "*NWC Entities*") is a Delaware limited liability company having a principal place of business at 2424 North Federal Highway, Suite 418, Boca Raton, Florida.

16. Defendants John Does 1-10 are other individuals who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of John Does 1-10 are unknown, but can and will be ascertained through discovery.

17. Defendants Doe Corporations 1-10 are other corporations who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Corporations 1-10 are unknown, but can and will be ascertained through discovery.

18. Defendants Doe Limited Partnerships 1-10 are other limited partnerships who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Limited Partnerships 1-10 are unknown, but can and will be ascertained through discovery.

19.    Defendants Doe Limited Liability Companies 1-10 are other limited liability companies who, upon information and belief, are subsequent transferees of the fraudulent transfers described herein. The true identities and citizenship of Doe Limited Liability Companies 1-10 are unknown, but can and will be ascertained through discovery.

## BACKGROUND

### A.    General Background

20.    On February 14, 2020 (the "*Petition Date*"), an involuntary petition was filed against The Worth Collection, Ltd. (the "*Debtor*") under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), thereby commencing the Chapter 7 Case.

21.    On March 24, 2021 (the "*Relief Date*"), the Bankruptcy Court entered an Order for Relief against the Debtor, thereby allowing the Chapter 7 Case to proceed.

22.    On June 23, 2021, the Bankruptcy Court entered an order appointing the Trustee as the chapter 7 trustee to administer the Chapter 7 Case.

### B.    Factual Background

*The Debtor's Historical Background and its Prior Owners*

23.    Founded in 1991, the Debtor was a direct-to-consumer women's fashion and apparel company marketed under 'Worth New York' and 'W by Worth' brand names.

24.    The Debtor sold women's apparel principally through a network of sales representatives (which the Debtor referred to as "stylists"), as well as via other avenues.

25.    From 2012 through 2015, the Debtor's financial performance generally plateaued.

26.    From 2012 through 2015, the Debtor's revenues and profits remained flat as a result of a stagnant stylist count, difficulty attracting new stylists and growing the revenue of existing stylists, and an aging customer base.

4

27. On or about September 29, 2016, a series of transactions (collectively, the "*LBO Transaction*") were consummated, pursuant to which, among other things, the Debtor's equity interests were transferred to a new owner and the Debtor took on over twenty-five million dollars ($25,000,000) of secured debt.

28. Pursuant to the LBO Transaction, over thirty-nine million dollars ($39,000,000) was transferred to ultimately be received by the former direct and indirect equity holders of the Debtor and by certain of the Debtor's directors and officers.

29. The LBO Transaction significantly increased the Debtor's debt.

30. The LBO Transaction was made with actual intent to hinder, delay, or defraud certain creditors of the Debtor.

31. The Debtor was insolvent upon the closing of the LBO Transaction or became insolvent as a result of the LBO Transaction.

32. The LBO Transaction caused the Debtor to engage in a transaction for which the remaining assets of the Debtor were unreasonably small in relation to transaction.

33. By virtue of the LBO Transaction, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

34. The Debtor did not receive reasonably equivalent value for the LBO Transaction.

35. Prior to the LBO Transaction, The Worth Collection Holdings, LLC ("*Holdings*"), an entity affiliated with Catterton Managing Partner V, L.L.C. ("*CMPV*, and together with Holdings and Worth Acquisition, LLC the "*Catterton SPV's*") and Catterton Management Company, L.L.C. ("*Catterton*:), owned all of the issued and outstanding stock of the Debtor.

36.    Holdings was, in turn, owned by the following equity holders (collectively, the "*Former Equity Holders*" or "*Initial Transferees*," listed in order of volume of shares): Acquisition; Davis; Rosenberg; DeFeo; Grossman; Diana Manley ("*Manley*"); Wendy Selig-Prieb ("*Selig-Prieb*"); Courtney Denby ("*Denby*"); Andrea Weiss ("*Weiss*"); and Lamira Fondren ("*Foundren*").

37.    CMPV was the seller representative of the Former Equity Holders selling their interests via the LBO Transaction and held the equity of Acquisition.

38.    CMPV and/or Catterton, either directly or indirectly, received over $31 million dollars in proceeds from Acquisition in connection with the LBO Transaction.

***The LBO Transaction***

39.    The LBO Transaction was accomplished via a series of transactions (each a "*Transaction*," and collectively, the "*Transactions*") that were ultimately made in furtherance of the acquisition of the Debtor by NWCP or entities related to NWCP.

40.    The significant Transactions that comprise the LBO Transaction are listed below.

A)    <u>Retention of Rothschild and Solicitation of Interested Purchasers</u>

41.    Sometime in the beginning of 2016, the Debtor's Former Equity Holders, led by Catterton and the Catterton SPV's, began to explore a sale of the Debtor.

42.    On or around the time that the Debtor's Former Equity Holders began to explore a sale of the Debtor, Rothschild & Co., Inc. ("*Rothschild*") was retained to serve as a financial consultant and investment banker in connection with a sale of the Debtor or the Debtor's business.

43.    Rothschild's retention with regard to a sale of the Debtor or the Debtor's business was for the purpose of, among other things, soliciting the interest of potential purchasers,

evaluating bids from prospective purchasers, and assembling and preparing financial "due diligence" documents and other marketing materials.

44.    In June 2016, Rothschild prepared a "final bid summary" outlining two potential offers to purchase the Debtor, one from Hypatia Capital ("the *Hypatia Offer*"), and another from NWCP (the *NWCP Offer*," and together with the Hypatia Offer, the "*Final Offers*").

45.    The key terms of the Final Offers are summarized below:

| | Hypatia Offer | NWCP Offer |
|---|---|---|
| Underlying Metrics Proposed by Purchaser | $30.81mm valuation (calculated as a five-multiple of (5x) purchaser's proposed adjusted EBITDA of $6.162mm) | $41.0mm valuation (calculated as a six-multiple of (6x) purchaser's proposed adjusted EBITDA of $6.8mm) |
| Percentage Acquired | 100% | 100% |
| Funding Sources | - Purchaser funding<br>- Up to a $21.8mm loan facility ($18.8mm term loan, $3.0mm revolver)<br>- Leverage at closing not to exceed 2.25x to 2.50x LTM adjusted EBITDA including revolver, term loan, capital leases, and all other senior debt | - Purchaser funding<br>- Up to a $27.5mm loan facility ($23.5mm term loan, $4.0mm revolver)<br>- Leverage at closing not to exceed 3.5x TTM adjusted EBITDA including revolver and term loan |
| Assumptions underlying valuation | - 2015 adjusted EBITDA of $6.162mm excludes marketing expenditures, showroom operations, salesforce personnel changes, and other personnel expenditures (represents a 5.0x EBITDA multiple) | - TTM as of April 2016 net revenue of $78.2m and adjusted EBITDA of $6.8mm (excludes recurring marketing expenditures previously included as New Venture add-backs)<br><br>- On track to achieve 2016 net revenue of $82.5mm and adjusted EBITDA of $7.9mm<br>- Company to achieve DBD and agency forecast in 2016 |
| Employment agreements | None | - Requested key employment agreements with current management |

| | | - Equity incentive plan of up to 10% for key senior management |
| --- | --- | --- |

46.    As outlined above, the Hypatia Offer and the NWCP Offer differed in several aspects.

47.    The NWCP Offer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the Hypatia Offer.

48.    The NWCP Offer was based on a higher assessment of the Debtor's adjusted EBITDA than the Hypatia Offer.

49.    The NWCP Offer was based on funding the transaction with more debt than the Hypatia Offer.

50.    Rothschild's "final bid summary" outlining the Final Offers to purchase the Debtor did not indicate that the Hypatia Offer was based on post-closing projections.

51.    Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did indicate that the NWCP Offer was based on post-closing projections.

52.    The Former Equity Holders accepted the NWCP Offer, rather than the Hypatia Offer.

B)    <u>The Stock Purchase</u>

53.    On or about September 29, 2016, the Debtor, Holdings, DeFeo, and the members of Holdings (collectively, the "*Sellers*"), CMPV (as seller representative), and Worth Collection Intermediate Holdings, LLC ("*Worth Intermediate*") entered into a Stock Purchase Agreement dated September 29, 2016 (the "*SPA*").

54.    Worth Intermediate was a special purpose holding company established by NWCP to acquire all of the issued and outstanding shares of capital stock of the Debtor.

8

55.     Pursuant to the SPA, Worth Intermediate acquired all of the issued and outstanding shares of capital stock of the Debtor (the "*Stock Transfer*").

56.     The purchase price of the Stock Transfer was payable by Intermediate and was equal to forty-million dollars ($40,000,000) plus cash on hand, plus or minus the amount, if any, by which preliminary working capital was greater than or less than target net working capital, minus all indebtedness of the Debtor, minus certain expenses (the "*Purchase Price*").

57.     NWCP funded twenty-million dollars ($20,000,000) at the closing of the LBO Transaction.

C)      <u>The Transaction Loans</u>

58.     NWCP, either directly or indirectly, caused the Debtor and one or more of Worth Intermediate or Worth Investment Holdings, LLC ("*WIH*") to enter into the following financing agreements:

(i)     *Borrowing of the Niagara/KeyBank Loan*

59.     On or around September 29, 2016, the Debtor and Worth Intermediate (together, the "*Borrowers*") entered into that certain Amended and Restated Credit and Security Agreement (the "*Niagara Agreement*") with First Niagara Commercial Finance, Inc. ("*First Niagara*"), whereby First Niagara Bank issued a line of credit in the amount of $10,000,000 (the "*Niagara/KeyBank Loan*") for the purposes of (i) funding in connection with the Stock Transfer; (ii) paying fees and expenses in connection with the Stock Transfer, including certain expenses incurred by First Niagara and/or other lenders; (iii) repayment of certain debt of outstanding on the date of the Stock Transfer; (iv) to facilitate the issuance of certain letters of credit; and (v) working capital or general corporate purposes.

60.     At the closing of the LBO Transaction, the Debtor granted a first-priority security interest in the Debtor's operating assets to First Niagara, and the Debtor granted a second-priority security interest in the Debtor's intellectual property assets to First Niagara.

(ii)     *Borrowing of the Monroe Loan*

61.     On or around September 29, 2016, the Debtor and Worth Intermediate entered into that certain Term Loan Credit and Security Agreement (the "*Monroe Credit Agreement*") administered by Monroe Capital Management Advisors, LLC ("*Monroe*").

62.     Pursuant to the Monroe Credit Agreement, Worth Intermediate obtained funding in the amount of $22,379,000 from the Monroe Facility (the "*Monroe Loan*"), as partial funding of the Purchase Price.

63.     At the closing of the LBO Transaction, the Monroe Credit Agreement provided for one or more term loans which were to be partially amortized, with a substantial balloon payment to be due on September 29, 2021.

64.     At the closing of the LBO Transaction, the Debtor granted a first-priority security interest in the Debtor's intellectual property assets to Monroe, and the Debtor granted a second-priority security interest in the Debtor's operating assets to Monroe.

D)     The Closing Distributions

65.     A breakdown of the other transactions associated with the closing of the Stock Transfer (collectively, the "*Closing Distributions*") is outlined below:

| Cash Sources | | Cash Uses | |
|---|---|---|---|
| First Niagara Revolving Credit Facility | $2,900,000.00 | Closing Cash Payments to Sellers | $38,918,725.51 |
| Monroe Capital Term Loan | $22,379.000.00 | NWC Fees & Expenses | $1,371,831.05 |

10

| | | | |
|---|---|---|---|
| NWC | $20,000,000.00 | Escrow Amount for Working Capital | $400,000.00 |
| | | Escrow Amount for Purchase Price Escrow | $500,000.00 |
| | | Advance Amount to CMPV | $100,000.00 |
| | | Indebtedness Paid | $1,447,818.24 |
| | | Transaction Fees (including D&O tail insurance) | $1,324,960.09 |
| | | Change of Control Bonuses | $134,166.65 |
| | | 57th Street Lease Debt | $23,319.54 |
| | | Cash to Company | $1,058,178.92 |
| **Total Sources** | **$45,279,000.00** | **Total Uses** | **$45,279,000.00** |

66.     Of the $45,279,000 of Closing Distributions, over $39 million was transferred to the Initial Transferees and some or all of the $31 million to Acquisition was transferred upstream to the Subsequent Transferees, as follows:

| **Equity Holder** | **Estimated Portion of Proceeds (collectively, the "*Equity Distributions*")** |
|---|---|
| Acquisition | $31,654,556.16 |
| Davis | $3,222,650.13 |
| Rosenberg | $3,476,319.07 |
| DeFeo | $1,308,050.07 |
| Grossman | $115,331.29 |
| Manley | $32,951.80 |
| Selig-Prieb | $32,951.80 |
| Denby | $32,951.80 |

11

| Weiss | $16,481.70 |
| Fondren | $16,481.70 |
| **Total** | $39,908,725.51 |

67.     Each of the Initial Transferees and Subsequent Transferees received a portion of the proceeds from the LBO Transaction in the form of equity distributions.

68.     In addition, DeFeo and Grossman received transaction bonuses of $61,250 and $52,500, respectively, for completing the LBO Transaction, above and beyond benefits they received as equity holders.

69.     Rosenberg, DeFeo, and Grossman remaining in positions as officers of the Debtor for a period following the LBO transaction.

70.     NWCP received a payment in the amount of $400,000 in connection with the LBO Transaction (the "*NWC Closing Fee*").

71.     As part of the "Transaction Fees" paid in conjunction with the LBO Transaction, Rothschild received a fee in the amount of $1,019,947.79 (the "*Rothschild Distribution*") as part of the Closing Distributions.

72.     A summary of the transactions as they relate to the LBO Transaction, broken down by each party, is provided below:

| Party | Acquired (+) | Consideration (-) |
|---|---|---|
| The Debtor | Satisfaction of $2,373,966.22 in pre-closing debt | Granting of "blanket" security interests to First Niagara and Monroe<br>Assumption of over $30 million in new debt<br>Obligations to make Consulting Fee payments to NWCP |
| Worth Intermediate | All equity interests of the Debtor | Granting of "blanket" security interests to First Niagara and Monroe |

| | Ability to borrow under the Monroe Loan to acquire all equity interests of the Debtor | Assumption of over $30 million in new debt |
|---|---|---|
| Former Equity Holders | Aggregate cash payment of $38,918,725.51 | Sale of all equity interests of the Debtor |
| NCWP | Control of the Debtor<br>Right to receive Consulting Fee payments<br>Receipt of NWC Closing Fee | |
| Monroe Facility | First or second priority security interests the Debtor's assets<br>Right to receive payments on the Monroe Loan, including interest | The Monroe Loan |
| First Niagara | First or second priority security interests the Debtor's assets<br>Right to receive payments on the First Niagara Loan, including interest | |
| Rothschild | Receipt of the Rothschild Distribution | |
| DeFeo | Receipt of $61,250 transaction bonus | Sale of interests in Holdings |
| Grossman | Receipt of $52,500 transaction bonus | Sale of interests in Holdings |

***Financing Events Subsequent to the LBO Transaction***

73. Within approximately a year after entering into the Credit Agreement, numerous events of default by the Borrowers existed under the Credit Agreement.

74. Within approximately a year after entering into the Monroe Credit Agreement, the Borrowers informed Monroe that the Borrowers were unlikely to comply with the financial covenants set forth in Sections 5.2(a) and 5.2(b) of the Credit Agreement.

75. Within approximately a year after entering into the Monroe Credit Agreement, the Borrowers informed Monroe that (i) the Borrowers have failed to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.00 in violation of Section 5.2(a) of the Monroe Credit

13

Agreement (ii) the Borrowers have failed to maintain a Total Debt to EBITDA Ratio of no more than 4.00 to 1.00, and (iii) the Borrowers failed to comply with certain other provisions of the Monroe Credit Agreement, all of which resulted in events of default under the Monroe Credit Agreement.

76.     The Monroe Loan was subsequently amended four (4) times between November 2017 and December 2018 to, among other things, waive numerous events of default.

77.     Upon the closing of the LBO Transaction, First Niagara and Monroe asserted secured loans (the "*LBO Obligations*") in the aggregate of over twenty-five million dollars ($25,000,000) collateralized by security interests in the Debtor's assets.

78.     The Niagara/KeyBank Loan was later assigned to KeyBank National Association ("*KeyBank*"), First Niagara's successor by merger.

79.     Subsequent to the closing of the LBO Transaction, the Debtor did not generate enough funds to service the LBO Obligations while also fulfilling the Debtor's other financial obligations.

80.     In the period from the closing of the Transaction through June 25, 2019, the Debtor continued to amass operating losses.

81.     On or about June 25, 2019 (the "*MidCap Closing Date*"), the Debtor borrowed additional capital from MidCap Financial Trust (the "*MidCap Loan*"), as administrative agent ("*MidCap*") for certain lenders.

82.     Among other uses, the MidCap Loan satisfied the Debtor's obligations to First Niagara.

83.     MidCap provides loans to borrowers who are greater credit risks than borrowers of First Niagara.

84.     Because MidCap provides loans to borrowers who are greater credit risks than borrowers of First Niagara, MidCap charges higher rates on its loans than First Niagara charges on similar types of loans.

85.     The Debtor's obligations to MidCap were secured by a first-priority security interest in the working capital assets of the Debtor and by a second-priority security interest in the intellectual property assets of the Debtor.

86.     Subsequent to the MidCap Closing Date, MidCap engaged the services of MCA Financial Group ("*MCA*"), an advisory firm, with regard to the Debtor.

87.     Within six (6) months of the MidCap Closing Date, MCA had prepared a plan to winddown and liquidate the Debtor's business, and such plan was actually implemented commencing in December 2019.

***The LBO Transaction and Transfer of over $39 Million to the Initial Transferees and Subsequent Transferees was Rife with Fraud***

88.     Via the LBO Transaction, the Debtor granted blanket security interests in all of its assets and incurred over $25 million in new debt without the Debtor receiving anything close to reasonably equivalent value in return.

89.     The principal beneficiaries of the LBO Transaction were the Former Equity Holders, who received, in total, approximately $39 million in connection with the leveraged acquisition by NWC.

90.     Of the $45,279,000 of Closing Distributions, after $2,373,966.22 was used to pay off certain indebtedness, the Debtor was left with a paltry $1,058,178.92 of cash to sustain all of its operating expenses and massive debt service on a going-forward basis.

15

91.     The Defendants were aware of the Debtor's financial condition prior to the LBO Transaction and understood that saddling the Debtor with over $25,000,000 in debt, upon the closing of the acquisition of the Debtor by NWC, would render the Debtor insolvent.

92.     The Defendants' intent in pursuing and closing the LBO Transaction can be inferred from various badges of fraud, including, without limitation:

a.      As part of the LBO Transaction, the Debtor granted blanket security interests to Monroe and First Niagara and left the Debtor with over $25 million in debt, while the only cognizable benefits that the Debtor received in exchange were (i) satisfaction of $2,373,966.22 of prior debt and (ii) a cash infusion of $1,058,178.92.

b.      As part of the LBO Transaction, the Former Equity Holders knowingly authorized, approved, and directed the Debtor to enter into a transaction that was so "one-sided" such that fraudulent intent may be inferred.

c.      The transfers were made to insiders – *i.e.*, the Former Equity Holders – who were the controlling shareholders, officers, and directors of the Debtor.

d.      The Debtor was rendered insolvent by the LBO Transaction.

e.      The Debtor was aware that it would not have enough funds to sustain its operating expenses and service its debt subsequent to the LBO Transaction.

f.      The Debtor was aware that the NWCP offer was substantially higher the next highest bid obtained by Rothschild for the Debtor's business.

g.      The Debtor was aware that the cost of the Stock Transfer was substantially higher the next highest bid obtained by Rothschild for the Debtor's business.

h.      The Debtor was aware that the NWCP offer required substantially more borrowing than the next highest bid obtained by Rothschild for the Debtor's business.

i.      The Debtor was aware that the Stock Transfer required substantially more borrowing than the next highest bid obtained by Rothschild for the Debtor's business.

j.      The Debtor was aware that the NWCP offer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

k.      The Debtor was aware that the cost of the Stock Transfer was based on a valuation of the Debtor's business at a higher multiple of EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

l.      The Debtor was aware that the NWCP Offer was based on a higher assessment of the Debtor's adjusted EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

m.      The Debtor was aware that the cost of the Stock Transfer was based on a higher assessment of the Debtor's adjusted EBITDA than the next highest bid obtained by Rothschild for the Debtor's business.

n.      The Debtor was aware that Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did not indicate that the Hypatia Offer was based on post-closing projections, whereas the same "final bid summary" did indicate that the NWCP Offer was based on post-closing projections.

17

o.      The Debtor was aware that Rothschild's "final bid summary" outlining the two potential offers to purchase the Debtor did not indicate that the Hypatia Offer was based on post-closing projections, whereas the cost of the Stock Transfer was based on post-closing projections.

***Ownership of the Debtor Subsequent to the 2016 LBO Transaction***

93.     NWCP formed three (3) entities to consummate the LBO Transaction (collectively, the "*Debtor Affiliates*," and together with the Debtor, the "*Worth Entities*"): (i) NWC Worth Collection Holdings, LLC ("*NWCWCH*"), the master vehicle, an entity wholly owned by NWCP; (ii) WIH, an entity wholly owned by NWCWCH, and (iii) Worth Intermediate, the "purchaser" in the LBO Transaction, an entity wholly owned by WIH.

94.     The following chart describes the ownership structure of the Debtor and certain related parties upon the closing of the LBO Transaction:



95.    In conjunction with the LBO Transaction, on or about September 29, 2016, Worth Intermediate and NWC entered into a consulting agreement (the "*Consulting Agreement*").

96.    The Consulting Agreement provided, among other things, that Worth Intermediate would pay an annual fee to NWC equal to the greater of (i) $350,000 and (ii) 4% of EBITDA for the applicable fiscal year.

97.    Worth Intermediate either remitted, or caused the Debtor to remit, hundreds of thousands of dollars to NWC in connection with the Consulting Agreement (the "*Consulting Fees*") at a time when the Debtor was insolvent.

98.    NWCGP is the general partner for NWC.

99.    During the one (1) year preference period for insiders (the "*Preference Period*") preceding the Petition Date, NWC received at least one payment in the amount of $40,099.03. The Trustee may discover additional preferential transfers as his investigation continues (all such transfers are collectively referred to as the "*NWC Preferential Transfers*").

***The Debtor's Financial Condition Leading up and Subsequent to the LBO Transaction***

100.    Prior to the LBO Transaction, the Debtor had total indebtedness in the amount of $2,373,966.22.

101.    In the year ending on December 31, 2014, the Debtor incurred $77,000 in interest and financing related expenses, and had net sales of $76,581,000 and a positive net income of $1,686,000.

102.    In the year ending on December 31, 2015, the Debtor incurred $23,000 in interest and financing related expenses, and had net sales of $78,507,000 and a positive net income of $1,398,000.

19

103.    Upon the closing of the LBO Transaction, the Debtor was obligated for over $25,000,000 in debt.

104.    Upon the closing of the LBO Transaction, the Debtor only had $1,058,178.72 in funds in depository accounts.

105.    The staggering debt resulting from the LBO Transaction caused the Debtor's interest and financing related expenses to skyrocket to $1,760,000 in 2016 — an over five-thousand percent (5,000%) increase from the prior year, despite the closing of the LBO Transaction occurring after approximately nine of the twelve months in that calendar year.

106.    The Debtor operated at a net loss of $1,610,000 in 2016.

107.    In 2017, the Debtor's interest and financing related expenses increased to $2,483,000.

108.    The Debtor operated at a net loss of $9,317,000 in 2017, the first full calendar year after the LBO Transaction.

109.    The Debtor had approximately $12 million in cash and cash equivalents at the end of 2014.

110.    The Debtor had almost $5 million in cash and cash equivalents at the end of 2015.

111.    The Debtor's cash dwindled to $445,000 in cash and cash equivalents at the end of 2016.

112.    The Debtor's cash position at the end of 2017 was lower than its cash position at the end of 2016.

113.    The Debtor's cash position at the end of 2018 was lower than its cash position at the end of 2017.

114. The LBO Transaction amounted to a windfall payout to the Debtor's prior equity owners, with the Debtor picking up the tab in the form of millions of dollars in debt and leaving the Debtor's creditors at risk, maintaining a bleak amount of operating cash in relation to its significant post-LBO Transaction debt obligations, and pledging all of its assets as security for the newly-incurred debt.

115. Notwithstanding the Debtor's dire financial condition following the LBO Transaction, the NWC Entities continued to drain the insolvent Debtor of resources through the Consulting Fees and NWC Preferential Transfers.

***The Worth Entities Lack Independent Corporate Control Over Their Own Administration.***

116. The Debtor Affiliates exercise complete control and domination over the Debtor such that they have no legal existence separate and distinct from the Debtor.

117. The Debtor and one or more of the Debtor Affiliates are parties to the Monroe Credit Agreement, to which each are obligated to make repayments to Monroe.

118. In an attempt to hide assets from creditors, the Debtor Affiliates, under the direction of NWC, caused multiple intercorporate transfers to occur between the Worth Entities so as to shield liability from transfers that are otherwise avoidable.

119. Subsequent to the LBO Transaction, a number of individuals served as a director, officer, and/or manager of one of the Worth Entities concurrently while serving the same role with another one of the Worth Entities.

***Notice to Defendants Regarding Amendment to Complaint***

120. It is the Trustee's intention to avoid, recover, or pursue all transfers or amounts that the Trustee is entitled to under applicable law and where the Trustee determines that pursuing such action is in the best interest of the Debtor's bankruptcy estate. Accordingly, the Trustee hereby

21

provides notice that he reserves the right to amend this Complaint to include, without limitation: (i) additional transfers, (ii) modifications of and/or revisions to the Defendant's name, (iii) additional defendants, and/or (v) additional causes of action (collectively, the "*Amendments*") that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this Complaint.

## CLAIMS FOR RELIEF

### COUNT I

### (Substantive Consolidation)

121.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

122.    With respect to a request to substantively consolidate the debtor with non-debtor parties, the Third Circuit has stated has follows:

> A proponent of substantive consolidation must demonstrate one of two rationales for its application, either that (i) prepetition, the entities for whom substantive consolidation is sought] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity; or (ii) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*In re Lisanti Foods Inc.*, 241 Fed. Appx. 1, 2 (3d Cir. 2007) (referencing *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

123.    The Worth Entities are inextricably intertwined both operationally and financially.

124.    The Worth Entities shuffled assets between each other with the goal of shielding assets from creditors and insulating liability.

125.    At its core, the Worth Entities constitute a single unified entity.

126.    The separateness of the Worth Entities was disregarded so significantly such that more than one of the Worth Entities were named as parties to the SPA and the Worth Entities had overlapping directors and officers.

127.    To treat the Worth Entities as separate entities would severely prejudice the Debtor's creditors, as it would shield certain of the Worth Entities from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated.

128.    The time and expense necessary to attempt to unscramble the entanglement of the Debtor's affairs with that of the other Worth Entities is so substantial that no accurate identification and allocation of assets is possible in the absence of substantive consolidation.

129.    No harm will come to the Worth Entities should this Court enter an order of substantive consolidation because these entities are already so entirely entangled.

130.    The Worth Entities have already effectively ceased operations.

131.    Substantive consolidation will allow a truly equitable distribution of assets among the Debtor's creditors by treating the Debtor and the other Worth Entities as a single economic unit.

132.    If the Worth Entities are not substantively consolidated, Catterton and/or CMPV may receive a windfall at the expense of creditors of the Debtor.

133.    There is substantial precedent for a bankruptcy court to grant non-debtor substantive consolidation on a *nunc pro tunc* basis. *See, e.g.*, *In re DBSI Inc.*, Case No. 08-12687 (PJW), Findings of Fact, Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation [Docket No. 5924], at ¶ J.

**WHEREFORE**, the Trustee respectfully seeks entry of an order of this Court ordering substantive consolidation, *nunc pro tunc*, of the Debtor's estate with the Worth Entities, effective as of the Petition Date.

## COUNT II

## (Declaratory Relief: Piercing the Corporate Veil)

134.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

135.    With the assistance of high-level management personnel of the Debtor, the Worth Entities exercised such a high degree of domination and control over the Debtor such that the Worth Entities have no separate existence but rather operate as a single entity and enterprise.

136.    There is a unity of interest and ownership between the Worth Entities such that the separate personalities of the corporations and the owners no longer exist.

137.    The other Worth Entities are mere instrumentalities, agents, and/or alter egos of the Debtor that have no legal existence or purpose separate and distinct from the Debtor.

138.    Further, the Debtor was left undercapitalized relative to the Debtor's undertakings, including, but not limited to, entering into the PSA.

139.    To treat the other Worth Entities as separate entities from the Debtor would severely prejudice the Debtor's creditors, as it would shield the Catterton and/or CMPV from liability on certain causes of action, including, without limitation, transfers that would otherwise be avoidable if the Worth Entities were consolidated.

140.    Under these circumstances, it would be unfair and inequitable to treat the other Worth Entities as separate entities from the Debtor.

141.    To adhere to the doctrine of the corporate entity would promise injustice and/or protect fraud.

WHEREFORE, the Trustee respectfully seeks entry of an order declaring that the other Worth Entities are mere instrumentalities, agents, and/or alter egos of the Debtor and that the Worth Entities are a single legal entity.

## COUNT III

### (Declaratory Relief – Collapsing of Transactions Associated with the LBO Transaction)

142.    The Trustee incorporates all preceding paragraphs as if fully set forth herein.

143.    As stated by this Court in *Official Committee of Unsecured Creditors v. The CIT Group/Business Credit, Inc.* (*In re Jevic Holding Corp.*), "[t]he Third Circuit has recognized the propriety of collapsing multiple transactions and treating them as one integrated transaction for the purpose of assessing a defendant's fraudulent transfer liability." 2011 WL 4345204, at *4 (Bankr. D. Del. Sept. 15, 2011) (Shannon, J.) (cleaned up); *see also In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y.2002) ("The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct.").

144.    An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability. "This [collapsing] approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent." *Mervyn's LLC v. Lubert-Adler Group IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 498 (Bankr. D. Del. 2010).

145.    To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions. *See In re Jevic Holding Corp.*, 2011 WL 4345204, at *4.

146.    The Delaware Bankruptcy Courts have considered the following factors when assessing whether the parties to the transactions sought to be collapsed had the requisite knowledge and intent to warrant consideration of the asserted transactions in the aggregate: whether all parties involved in the individual transactions had knowledge of the other transactions; whether each

25

transaction sought to be collapsed would have occurred on its own; and whether each transaction was dependent or conditioned on the other transactions. *Id.*

147. Each of the Transactions were dependent or conditioned upon one another.

148. The parties to the Monroe Credit Agreement and the LBO Transaction had knowledge of such other transaction.

149. The parties to the Monroe Credit Agreement and the Stock Transfer had knowledge of such other transaction.

150. The parties to the Monroe Credit Agreement and the Rothschild Distribution had knowledge of such other transaction.

151. The parties to the Monroe Credit Agreement and the Equity Distributions had knowledge of such other transaction.

152. The parties to the Monroe Credit Agreement and the Closing Distributions had knowledge of such other transaction.

153. The Monroe Loan and the LBO Transaction would not have occurred alone.

154. The Monroe Loan and the Stock Transfer would not have occurred alone.

155. The Monroe Loan and the Rothschild Distribution would not have occurred alone.

156. The Monroe Loan and the Equity Distributions would not have occurred alone.

157. The Monroe Loan and the Closing Distributions would not have occurred alone.

158. The Monroe Loan and the LBO Transaction are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

159. The Monroe Loan and the Stock Transfer are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

160.   The Monroe Loan and the Rothschild Distribution are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

161.   The Monroe Loan and the Equity Distributions are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

162.   The Monroe Loan and the Closing Distributions are appropriately "collapsed" with each other so as to view them as one singly integrated transaction.

**WHEREFORE**, the Trustee respectfully requests that this Court (a) collapse the Monroe Loan and the LBO Transaction with each other so as to view them as one single integrated transaction; (b) collapse the Monroe Loan and the Stock Transfer with each other so as to view them as one single integrated transaction; (c) collapse the Monroe Loan and the Rothschild Distribution with each other so as to view them as one single integrated transaction; (d) collapse the Monroe Loan and the Equity Distributions with each other so as to view them as one single integrated transaction; (e) collapse the Monroe Loan and the Closing Distributions with each other so as to view them as one single integrated transaction; and (f) for such other relief as the Court deems just and proper.

## COUNT IV

### (Avoidance of NWC Preferential Transfers Under 11 U.S.C. § 547)

163.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

164.   The NWC Preferential Transfers were made to the NWC by the Debtor.

165.   The Debtor made the NWC Preferential Transfers to or for the benefit of NWC in an aggregate amount of not less than $40,099.03.

166.   The NWC Preference Transfers were made from one or more of the Debtor's accounts and constituted transfers of an interest in property of the Debtor.

167.   During the Preference Period, NWC was a claimant of the Debtor at the time of each NWC Preferential Transfer by virtue of being an equity holder of the Debtor.

168.   At the time the NWC Preference Transfers were made, NWC was an "insider," as that terms is defined in section 101(31) of the Bankruptcy Code.

169.   Each NWC Preferential Transfer was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each NWC Preferential Transfer either reduced or fully satisfied a claim of NWC against the Debtor.

170.   Each NWC Preferential Transfer was made for, or on account of, an antecedent claim of NWC before such NWC Preferential Transfer was made.

171.   Each NWC Preferential Transfer was made while the Debtor was insolvent.  The Trustee is entitled to the presumption of insolvency for each NWC Preferential Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

172.   Each NWC Preferential Transfer was made during the Preference Period.

173.   As a result of each NWC Preferential Transfer, NWC received more than it would have received if (i) the NWC Preferential Transfers had not been made; and (iii) NWC received payment on account of its claims under the provisions of the Bankruptcy Code.

174.   Upon information and belief, NWC was the initial transferee of the NWC Preferential Transfers or the immediate or mediate transferee of such initial transferee or the entity for whose benefit the NWC Preferential Transfers were made.

175.   Accordingly, the Trustee is entitled to an order and judgment against NWC avoiding each Preferential Transfer pursuant to section 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the Defendant avoiding each Transfer pursuant to section 547(b) of the Bankruptcy Code,

awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT V

**(Recovery of NWC Avoided Preferential Transfers Under 11 U.S.C. § 550)**

176.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

177.   The Trustee is entitled to avoid the above-described NWC Preferential Transfers pursuant to section 547(b) of the Bankruptcy Code.

178.   NWC was the initial transferee of the Preferential Transfers or the immediate or mediate transferee of such initial transferee or the entity for whose benefit the NWC Preferential Transfers were made.

179.   Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from the Subsequent Transferees all NWC Preferential Transfers, plus interest thereon to the date of payment and the costs of this action.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from the Defendant all Transfers pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT VI

**(Avoidance and Recovery of the Closing Fee – Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1304)**

180.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

181.   Section 544 of the Bankruptcy Code provides as follows:

(a)   The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

29

(1)     a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2)     a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3)     a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1)  Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title.

(b)(2)  Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2).  Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544.

182.    Delaware Code Title 6, § 1304, titled "Transfers fraudulent as to present and future creditors," provides, in pertinent part, as follows:

(a)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)     With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2)     Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a.      Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.      Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

30

6 Del. C. § 1304.

183.    After substantively consolidating the Worth Entities in accordance with Count I or piercing the corporate veil and granting alter ego declaratory relief in accordance with Count II, it follows that the Debtor did not receive reasonably equivalent value in exchange for the Closing Fee or the Closing Fee was made with actual intent to hinder, delay or defraud any creditor of the Debtor.

184.    The Monroe Credit Agreement was an obligation of the Debtor. The Debtor did not receive reasonably equivalent value for entering into the Monroe Credit Agreement. Further, the Debtor's prior owners intended and planned that all transactions involving the LBO Transaction would occur simultaneously and were interdependent, related transactions. All of those transactions, namely the Monroe Credit Agreement and the SPA, are collapsible into a single, integrated transaction for purposes of determining whether those transfers were fraudulent.

185.    After collapsing the Monroe Credit Agreement with the SPA, it follows that the Debtor did not receive reasonably equivalent value from the Closing Fee or the Closing Fee was made with actual intent to hinder, delay or defraud any creditor of the Debtor.

186.    The Debtor did not receive reasonably equivalent value in exchange for the Closing Fee or the Closing Fee was made with actual intent to hinder, delay or defraud any creditor of the Debtor.

187.    At the time of the Closing Fee, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

188.    At the time of the Closing Fee, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they became due.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the Defendant avoiding the Closing Fee pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1304, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees and punitive damages to the extent of actual fraud).

**COUNT VII**

**(Avoidance and Recovery of the Closing Fee – Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1305)**

189.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

190.    Delaware Code Title 6, § 1305, titled "Transfers fraudulent as to present creditors," provides, in pertinent part:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b)    A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

6 Del. C. § 1305.

191.    The Debtor made the Closing Fee without receiving a reasonably equivalent value in exchange for such transfer.

192.    The Debtor was insolvent or became insolvent as a result of the Closing Fee.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the Defendant avoiding the Closing Fee pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1305, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT VIII

**(Avoidance and Recovery of Consulting Agreement and Consulting Fees – Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1304)**

193.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

194.    Section 544 of the Bankruptcy Code provides as follows:

(a)    The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1)    a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2)    a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3)    a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title.

(b)(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2).  Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544.

195.    Delaware Code Title 6, § 1304, titled "Transfers fraudulent as to present and future creditors," provides, in pertinent part, as follows:

33

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

  (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or

  (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. C. § 1304.

196. After substantively consolidating the Worth Entities in accordance with Count I or piercing the corporate veil and granting alter ego declaratory relief in accordance with Count II, it follows that the Debtor did not receive reasonably equivalent value in exchange for the Consulting Fee or the Consulting Fees was made with actual intent to hinder, delay, or defraud any creditor of the Debtor.

197. The Monroe Credit Agreement was an obligation of the Debtor. The Debtor did not receive reasonably equivalent value for entering into the Monroe Credit Agreement. Further, the Debtor's prior owners intended and planned that all transactions involving the LBO Transaction would occur simultaneously and were interdependent, related transactions. All of those transactions, namely the Monroe Credit Agreement and the SPA, are collapsible into a single, integrated transaction for purposes of determining whether those transfers were fraudulent.

198. After collapsing the Monroe Credit Agreement with the SPA, it follows that the Debtor did not receive reasonably equivalent value from the entry into the Consulting Agreement

34

or the Consulting Fees, or the Consulting Agreement or the Consulting Fees were made with actual intent to hinder, delay, or defraud any creditor of the Debtor.

199.    The Debtor did not receive reasonably equivalent value in exchange for the entry into the Consulting Agreement or the Consulting Fees, or the the Consulting Agreement or the Consulting Fees were made with actual intent to hinder, delay, or defraud any creditor of the Debtor.

200.    At the time of the entry into the Consulting Agreement or the Consulting Fees, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

201.    At the time of entry into the Consulting Agreement or the Consulting Fees, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they became due.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the Defendant avoiding each Consulting Fee pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1304, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just (including an award of attorneys' fees and punitive damages to the extent of actual fraud).

## **COUNT IX**

**(Avoidance and Recovery of Consulting Agreement and Consulting Fees – Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544 and 550, and 6 Del. C. § 1305)**

202.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

203.    Delaware Code Title 6, § 1305, titled "Transfers fraudulent as to present creditors," provides, in pertinent part:

(a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor

35

made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b)      A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

6 Del. C. § 1305.

204.    The Debtor entered into the Consulting Agreement or paid the Consulting Fees without receiving a reasonably equivalent value in exchange for such transfer.

205.    The Debtor was insolvent at the time it entered into the Consulting Agreement or paid the Consulting Fee, or became insolvent as a result of the Consulting Fees.

**WHEREFORE**, the Trustee requests that the Court enter an order and judgment against the Defendant avoiding the Consulting Agreement and each Consulting Fee pursuant to section 544 of the Bankruptcy Code and 6 Del. C. § 1305, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT X

**(Avoidance and Recovery of Consulting Agreement and Consulting Fees Pursuant to 11 U.S.C. §§ 544 and 550, and Relevant Delaware State Law)**

206.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

207.    The Defendant is either (i) the initial transferee of the Consulting Agreement oir Consulting Fees or the entity for whose benefit the Consulting Agreement or Consulting Fees were made; or (ii) an immediate, mediate, or subsequent transferee of such initial transferee.

208.    To the extent that the transfer of one or more of the Consulting Agreement or the Consulting Fees are avoided under section 544 of the Bankruptcy Code and relevant Delaware

36

state law, the Trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from the Defendant the Consulting Agremeent and each Consulting Fee pursuant to section 550 of the Bankruptcy Code, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

## COUNT XI

**(Recovery of Avoided Fraudulent Transfers Under 11 U.S.C. § 544 and 6 Del C. § 1307)**

209.    The Trustee repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth herein.

210.    Title 6 of the Delaware Code, § 1307, titled "Remedies of creditors," provides:

(a)    In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:

(1)    Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .

6 Del. C. § 1307.

211.    To the extent that the transfer of the Closing Fee, the Consulting Agrement, and the Consulting Fees are avoided under 6 Del. C. § 1304, *et seq.*, the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property pursuant to 6 Del. C. § 1304, *et seq.*

212.    The transfer of the Closing Fee, the Consulting Agrement, and the Consulting Fees are avoidable.

**WHEREFORE**, the Trustee requests that the Court enter an order allowing the Trustee to recover from the Defendant the Closing Fee, the Consulting Agrement, and the Consulting Fees

pursuant to section 544 of the Bankruptcy Code and 6 Del C. § 1307, awarding interest thereon to the date of payment and the costs of this action to the Trustee, and for such other and further relief as the Trustee is entitled or the Court deems just.

Dated: March 24, 2023
Wilmington, Delaware

Respectfully submitted,

By: */s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk, Esq. (Bar ID 3320)
Goldstein & McClintock, LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

*-and-*

Harley J. Goldstein, Esq. (admitted *pro hac vice*)
Daniel C. Curth, Esq. (admitted *pro hac vice*)
Amrit S. Kapai, Esq. (admitted *pro hac vice*)
Steven Yachik, Esq. (admitted *pro hac vice*)
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
harleyg@goldmclaw.com
danc@goldmclaw.com
amritk@goldmclaw.com
steveny@goldmclaw.com

*Counsel for the Chapter 7 Trustee*

38